FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. MICHAEL ANDREW HARRINGTON,<br><br>*Plaintiff,*<br><br>V.<br><br>ART INSTITUTES INTERNATIONAL LLC,<br>ART INSTITUTE OF HOUSTON LLC,<br>DC ART INSTITUTE OF HOUSTON, LLC, &<br>STUDIO ENTERPRISE LLC<br><br>*Defendants.* | Civ. No. 4:20-mc-1941<br><br>JURY DEMANDED |

## ORIGINAL COMPLAINT
### Qui Tam Action Filed Under Seal Pursuant to False Claims Act

Relator Michael Andrew Harrington ("Relator" or "Harrington") files this Original Complaint on his own behalf and on behalf of the United States of America to recover damages and penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* against Defendants Art Institutes International LLC ("Ai"), Art Institute Of Houston LLC ("Ai Houston"), DC Art Institute of Houston, LLC ("DC Ai") and Studio Enterprise LLC ("Studio Enterprise") (collectively, "Defendants"), and would show as follows:

### INTRODUCTION

1. This is a civil action for damages and civil penalties pursuant to the False Claims Act. Defendants Ai, Ai Houston, DC Ai, and Studio Enterprise knowingly requested and received at least $2 million dollars in Title IV financial aid funds from the United States Department of Education for students who never enrolled with Defendants. When Relator Michael Andrew Harrington raised his concerns to his supervisor, Director of Operations Byron Chung, Chung immediately terminated him. Defendants received, and are believed to still receive, funds by

RELATOR'S FALSE CLAIMS ACT COMPLAINT 1

*FILED UNDER SEAL*

falsifying records submitted to the federal government, refusing to return the money, and taking out loans in the name of students who have no intention of enrolling at Ai Houston.

## PARTIES

2. Relator and individual Plaintiff Michael Andrew Harrington is an individual currently residing in Hartford County, Connecticut.

3. Defendant Art Institutes International LLC ("Ai") is a Pennsylvania Limited Liability Company that has the right to transact business in the State of Texas. Ai engages in business in this state, but has not designated or maintained a resident agent for service of process. Pursuant to Tex. Civ. Prac. & Rem. Code § 17.044, Defendant may therefore be served with process through the Texas Secretary of State.

4. Defendant Art Institute Of Houston LLC ("Ai Houston") is a Limited Liability Company of unknown residency that engages in business in this state, but has not designated or maintained a resident agent for service of process. Pursuant to Tex. Civ. Prac. & Rem. Code § 17.044, Defendant may therefore be served with process through the Texas Secretary of State. On information and belief, Ai Houston is a subsidiary of Ai that operates the Houston campus of Ai.

5. Defendant DC Art Institute of Houston, LLC ("DC Ai") is a Limited Liability Company of unknown residency that engages in business in this state, but has not designated or maintained a resident agent for service of process. Pursuant to Tex. Civ. Prac. & Rem. Code § 17.044, Defendant may therefore be served with process through the Texas Secretary of State.

6. Defendant Studio Enterprise LLC ("Studio Enterprise") is a Limited Liability Company of unknown residency that engages in business in this state, but has not designated or maintained a resident agent for service of process. Pursuant to Tex. Civ. Prac. & Rem. Code § 17.044, Defendant may therefore be served with process through the Texas Secretary of State.

*FILED UNDER SEAL*

7. Studio Enterprise provided enrollment management and marketing to AI Houston during 2019 and also employed Relator during part of 2019, including issuing some of his paychecks and 2019 tax documents. At some point during 2019, Studio Enterprise turned over management of the campus to DC Ai. DC Ai also became responsible for employing Relator, including issuing some of his paychecks and 2019 tax documents. Defendant Ai was also responsible for issuing Relator payment.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff is bringing suit pursuant to 31 U.S.C. § 3732(a), the False Claims Act.

9. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PROCEDURAL REQUISITES

10. All conditions precedent to filing this lawsuit have been met.

11. The facts and circumstances of the False Claims Act violations alleged in this Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, not in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

12. Relator is the original source of the information upon which this Complaint is based, as that term is used in the False Claims Act.

13. After filing this Complaint under seal, Relator will promptly disclose the allegations of this Complaint and written disclosure of substantially all material evidence and information to the United States in accordance with the False Claims Act, 31 U.S.C. § 3730(b).

*FILED UNDER SEAL*

# FACTS

**I.     The Arts Institute Has A Long History of Troubled Management and Allegations of Fraud Against the Government and Its Own Students.**

14.     At its height, for-profit college entity The Art Institutes had more than 50 campuses. The Art Institutes system was created in 1969 when Education Management Corporation ("EDMC") acquired The Art Institute of Pittsburgh. In 2014, the United States Department of Education reported that ten EDMC campuses, including several Art Institutes, were placed under heightened cash monitoring. In November 2014, EDMC was delisted from the NASDAQ amid financial difficulties, lawsuits, and investigations and its stock was valued at less than one cent per share.

15.     In November 2015, the United States Department of Justice reached a $95.5 million settlement with EDMC over allegations that the company defrauded taxpayers out of billions of dollars. The agreement, the largest False Claims Act settlement ever reached against a college, was part of an ongoing push by the Obama Administration to target abuses in the for-profit college industry. "The violations tainted the very fabric of EDMC's educational mission," said U.S. Attorney David Hickton when announcing the agreement. EDMC's practices, Hickton said, "victimized students who are hungry for an education in order to achieve a better life." The government alleged that by paying recruiters based on enrollments, EDMC schools "incentivize their recruiters to pressure applicants to enroll and, in doing so, to mislead applicants about the degree programs' cost, effectiveness and job placement rates."

16.     Following the public announcement of the settlement, dozens of Ai campuses closed between 2015 and 2018.

17.     In 2017, Education Management Corporation reported that it had sold the existing Art Institutes to The Dream Center Foundation, a Los Angeles-based Pentecostal organization with

FILED UNDER SEAL

no experience in higher education management. By early 2019, Dream Center Education Holdings, the nonprofit owner of the remaining Ai campuses, was facing bankruptcy. According to the New York Times, although at the time of the acquisition by the Dream Center, "skeptics warned that the charity was unlikely to pull off the turnaround it promised," "[w]hat they didn't foresee was just how quickly and catastrophically [Dream Center] would fail."[1]

18.     In January 2019, Education Principle Foundation, a Delaware nonprofit with no annual budget and almost no internet presence according to Inside Higher Ed,[2] acquired some of the struggling campuses from the Dream Center. The acquisition included Ai Houston and its branch campuses throughout Texas. Until Dec. 31, 2018, the Education Principle Foundation had been known as the Colbeck Foundation. Colbeck also owned or was closely connected to Defendant Studio Enterprise, which provided enrollment management and marketing to AI Houston during 2019. Studio Enterprise was personally funded by the principals of Colbeck Capital Management, a New York private equity firm.

19.     Ai Houston is now one of the few remaining Ai campuses still operating. However, Ai Houston is no stranger to its allegations of financial and educational irregularities. Defendants have been accused of fraud against their own students and against the federal government for decades. In 1999, for example, The Art Institutes International, Inc. and The Art Institute of Houston, Inc. were sued by hundreds of former and current students alleging that they were misled about the nature, quality and utility of the education they would receive at The Art Institute of Houston. In 2016, Ai's accreditation institution, the Commission on Colleges of the Southern

---

[1] *A College Chain Crumbles, and Millions in Student Loan Cash Disappears*, New York Times, Mar. 7, 2019, available at https://www.nytimes.com/2019/03/07/business/argosy-college-art-insititutes-south-university.html?action=click&module=Well&pgtype=Homepage&section=Education (last accessed June 23, 2020).
[2] *Former EDMC Campuses Bought by Private Investors*, Inside Higher Ed, Jan, 24, 2019, *available at* https://www.insidehighered.com/news/2019/01/24/private-investment-firm-behind-acquisition-art-institutes-and-south-university (last accessed June 23, 2020).

RELATOR'S FALSE CLAIMS ACT COMPLAINT                                                                                                    5

*FILED UNDER SEAL*

Association of Colleges and Schools, placed the Art Institute of Houston on probation for financial irregularities.

**II.      Relator Harrington Joins Defendants' Houston Campus in 2019 and Learns Defendants Are Continuing to Defraud the Federal Government.**

20.    Prior to joining Defendants, Relator Michael Andrew Harrington had over a decade of experience in admissions and higher education, with eight of those years as a Director of Admissions. Prior to working in academia, he was a highly commended police officer with the New York Police Department.

21.    On July 22, 2019, Harrington joined Defendants as Director of Enrollment for the Houston campus. In this role, he reported to Byron Chung, Director of Operations.

22.    Federal student aid programs are authorized under Title IV of the Higher Education Act of 1965 ("Title IV"), 20 U.S.C. §§ 1070-1099. One of the purposes of Title IV is to provide federal Pell Grants to eligible students. To be eligible to receive Title IV funds, a school must enter into a program participating agreement with the Department of Education. In signing such an agreement, the school (here, Defendants) promises to comply with all applicable federal statutes. Once students are qualified, they may apply to receive Title IV funds by completing the Free Application for Federal Student Aid ("FAFSA").

23.    On or about August 14, 2019, Harrington learned from Chung that Defendants had submitted FAFSA applications on behalf of approximately 150 student applicants who had not formally enrolled in the 2019-2020 academic year. Chung informed Harrington that, unless these students signed enrollment agreements with Defendants, Defendants would receive approximately $2 million dollars from the federal government—representing 585 course credits—for students who did not attend the school.

24.    Based on this information, Harrington initially believed that Defendants had

RELATOR'S FALSE CLAIMS ACT COMPLAINT                                                                                              6

*FILED UNDER SEAL*

committed a simple paperwork error and only needed these 150 students to fully execute their enrollment paperwork. Chung sent Harrington an excel sheet with the students' information and said that Harrington should contact each of them to formally execute the enrollment agreement. Chung informed Harrington that this would protect Defendants if the federal government audited the school.

25. On or about August 14, 2019, Harrington began reaching out to the students on the excel sheet emailed to him by Chung. He spoke to two students. Each of them reported that they had not enrolled with Defendants, they did not intend to enroll in the future, and they never authorized or requested that federal funds be withdrawn in their names and provided to Defendants.

26. Harrington was shocked and initially unsure of how he should speak to Chung about what he had learned. However, on or about August 21, 2019, he met with Chung and informed him that Harrington was concerned that the 150 students on the excel list did not intend to enroll with Defendants. Chung brushed Harrington off and told Harrington he was mistaken, that it was a simple paperwork error and that Harrington should continue to call the students on the list and make sure they signed their enrollment agreements.

27. Harrington did not do so. He continued to raise concerns to Chung that Defendants were seeking, receiving, and retaining federal Title IV funds for students who did not enroll in the 2019-2020 academic year. Chung disregarded Harrington's concerns and continued for the next several weeks to order Harrington to call the students on the list. Chung continued to falsely claim that the signed enrollment agreements were simply a formality to ensure that, if Defendants were audited by the federal government, Defendants could show that the students (for whom Defendants had already received Title IV funds) were officially enrolled even though they never attended classes and had no idea federal funds had been withdrawn in their name.

*FILED UNDER SEAL*

28. For many institutions of higher education, the process of submitting a FAFSA generally begins when the student applies to various colleges and simultaneously submits a FAFSA, which is generally due before the student learns which schools have accepted him or her. Once the student is accepted and learns of his or her aid awards from each school, the student goes to the FAFSA application website and selects which institution should receive his or her student aid from the federal government. The institution itself does not select itself through the FAFSA website; generally a student makes that selection for himself or herself.

29. Defendants, however, did not follow these general processes and did not even follow their own internal rules. When a student visited Defendants to learn more about enrollment in a degree program, he or she met with a financial aid counselor to discuss their options. The counselors would ask the student to sign numerous agreements all at once, including a Master Promissory Note, Entrance Counseling, and the FAFSA itself. The counselors told the student that filling out all the commitment forms was simply a way for the student to understand what loans they would qualify for, but Defendants and the counselors knew this was not true. Although Defendants knew the student was not committing to attend Defendants' Houston campus, Defendants' counselors induced the students to execute official loan requests that would direct federal funds into Defendants' accounts. Defendants then used these signed forms to request and receive Title IV funds under the student's name. Some of these students eventually enrolled, but others never did—regardless of their enrollment status, however, Defendants received and retained the Title IV funds from the federal government. The students who never actually enrolled were put on the excel list Chung then provided to Harrington.

30. Harrington observed other disturbing admissions irregularities. The Consent Judgement that EDMC entered into with the Department of Justice required an online or in-person

orientation prior to the students first class, at no cost to the student.[3] The orientation program was required to address topics such as study skills, organization, literacy, financial skills, and computer competency. Critically, during the orientation period, a student must be able to withdraw from enrollment without any costs, and any grants or financial aid received on behalf of the student must be returned to the lender. However, Defendants regularly broke this rule. Harrington personally observed the Vice President of Enrollment, Matthew Madrid, regularly submit a ticket to the IT department stating that the student attempted to access the online orientation but had technical difficulties and could not complete it. However, that was false and Madrid knew it was false: Defendants enrolled students who had never even attempted to access the online orientation.

31. The Consent Judgment also contained strict agreements regarding refunds of Title IV and other financial aid amounts. EDMC and the associated institutions, including Defendants, were required under the terms of the Consent Judgment to provide students with an enrollment agreement for their signature. The enrollment agreement was further required to explain that students were entitled to a full refund if they withdraw within seven days of the first day of class at an in-person school or twenty-one days at an online school. For the students on the excel sheet provided by Chung, however, they never even signed an enrollment agreement and therefore they had no knowledge they had the right to a refund. They did not even have any knowledge that Title IV funds had been withdrawn and retained by Defendants in the students' names.

32. Chung informed Harrington on numerous occasions in August and September 2019 that, unless these 150 students signed enrollment agreements with Defendants, Defendants would receive approximately $2 million dollars from the federal government—representing 585 course

---

[3] *See* Thomas J. Perrelli, Second Annual Report of the Settlement Administrator under the Consent Judgments with Education Management Corporation (EDMC), available at https://www.defendstudents.org/news/body/nsldn_20190206e.pdf (last accessed July 1, 2020).

RELATOR'S FALSE CLAIMS ACT COMPLAINT                                                                                           9

*FILED UNDER SEAL*

credits—that it was never entitled to receive.

33. Because Harrington never obtained any signatures on enrollment agreements from the 150 impacted students, Defendants knowingly received and retained approximately $2 million from the federal government and, specifically, the Department of Education's Title IV funding, that it was ineligible to receive.

### III. After Harrington Accuses Chung and Defendants of Fraud on the Government and the Students Themselves, Harrington is swiftly Terminated for Pretextual Reasons.

34. Over the month of September 2019, Chung continued to ask Harrington for the status of his attempts to encourage the 150 students on the excel sheet to sign enrollment agreements. Harrington continued to try to put Chung off. Finally, on or about Friday, September 27, 2019 (the last business day before Fall 2019 classes started on Monday, September 30, 2019), Harrington explained to Chung that he had not continued making the telephone calls after learning the true nature of the students' non-enrollment with Defendants. Harrington informed Chung that he would not be party to Chung's request because it was fraud on the federal government and on the students themselves.

35. On Wednesday, October 2, 2019, Chung abruptly terminated Harrington. Chung attempted to claim that Harrington was fired for inappropriately accessing student data. This claim is non-sensical. First, as Director of Admissions, Harrington had continuous and unlimited access to student data in order to complete his job duties. Second, the precise allegation against Harrington is that he sent an email on September 12, 2019 to former students who had previously attended a closed Ai campus to inform them that they could enroll at Ai's Houston campus and receive a 50% tuition discount. Harrington sent this email at Chung's direct request. The true reason for Harrington's termination was his September 27, 2019 conversation with Chung accusing him and Defendants of fraud on the federal government.

*FILED UNDER SEAL*

**FIRST CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(A): False Claims Act Violations**

36. Plaintiff incorporates by reference all of the allegations made in the proceeding paragraphs.

37. Through the acts described above, Defendants, their agents, and employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims for payment or approval in order to obtain federal student loan funds for students who never enrolled at Ai Houston.

38. The United States and its fiscal intermediaries, unaware of the falsity of the claims made or submitted by Defendants, their agents, and employees, paid and are believed to continue to pay Defendants for claims that would not have been paid had Defendants not submitted false and fraudulent claims for payment.

39. The United States has sustained damages as a result of Defendants' false or fraudulent claims in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(B): False Statements**

40. Plaintiff incorporates by reference all of the allegations made in the proceeding paragraphs.

41. Through the acts described above, Defendants, their agents, and employees knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim in order to obtain federal student loan funds for students who never enrolled at Ai Houston.

42. The United States and its fiscal intermediaries, unaware of the falsity of the records or statements that were material to false or fraudulent claims made or submitted by Defendants,

*FILED UNDER SEAL*

their agents, and employees, paid and are believed to continue to pay Defendants for claims that would not have been paid had Defendants not submitted false and fraudulent claims for payment.

43. The United States has sustained damages as a result of Defendants' use of false records or statement material to false or fraudulent claims in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(G): Obligation to Pay

44. Plaintiff incorporates by reference all of the allegations made in the proceeding paragraphs.

45. Through the acts described above, Defendants, their agents, and employees knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government.

46. The United States has sustained damages as a result of Defendants' use of false records or statement material to an obligation to pay or transmit money or property to the United States Government, or by knowingly concealing, avoiding, or decreasing an obligation to pay or transmit money to the United States Government in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### 31 U.S.C. § 3730(h): Retaliation Under the False Claims Act ("FCA Retaliation")

47. Plaintiff incorporates by reference all of the allegations made in the preceding paragraphs.

48. Relator engaged in activity protected by law. Specifically, he committed lawful acts in an effort to stop Defendants from committing violations of the False Claims Act.

49. Relator's complaints were made in good faith.

*FILED UNDER SEAL*

50. Relator reasonably believed that Defendants were violating the False Claims Act.

51. Defendants knew or suspected that Relator engaged in the protected activity.

52. Relator suffered adverse actions, including being terminated.

53. Relator's protected activity was a contributing factor in the adverse actions.

## FIFTH CAUSE OF ACTION
## Termination for Refusal to Commit an Illegal Act under Texas Law

54. Plaintiff incorporates by reference all of the allegations made in the preceding paragraphs.

55. Defendant terminated Relator's employment for the sole reason that Relator refused to perform an illegal act.

56. Relator has been adversely affected by Defendants' actions and has suffered damages as a result of those actions.

57. Defendants acted with malice and/or gross negligence toward Relator. The malice and/or gross negligence is attributable to Defendants as the acts at issues were committed by Defendants' Director of Operations and/or other agents, Defendants authorized the doing and manner of the acts, Defendants' agents were employed in a managerial capacity and/or were acting in the scope of employment, and/or Defendants or a manager of Defendants ratified or approved the acts.

## ATTORNEYS FEES AND COSTS

58. Plaintiff is entitled to litigation costs, expert witness fees, and reasonable attorney fees under 31 U.S.C. § 3729 et seq.

## JURY DEMAND

59. Plaintiff requests a trial by jury on all issues.

## PRAYER

*FILED UNDER SEAL*

60. For these reasons, Plaintiff asks for judgment against Defendants for the following:

    a. That Defendants cease and desist from violating the False Claims Act;

    b. That Defendant is liable to Plaintiff in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each Defendant for each violation of the False Claims Act;

    c. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

    d. 2 times the amount of back pay and interest on the pack pay;

    e. equitable relief, including but not limited to front pay and mental anguish compensation;

    f. special damages;

    g. reinstatement with the same seniority status that Relator would have had, but for the discrimination;

    h. pre-judgment and post-judgment interest as provided by law;

    i. reasonable attorney's fees;

    j. all costs of court; and

    k. any other relief to which Plaintiff may be entitled, whether in law or equity, including all relief necessary to make Plaintiff whole.

*FILED UNDER SEAL*

                Respectfully submitted,

/s/ Lawrence Morales II
Lawrence Morales II
ATTORNEY-IN-CHARGE
State Bar No. 24051077
Allison Sarah Hartry
State Bar No. 24083149
**THE MORALES FIRM, P.C.**
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
lawrence@themoralesfirm.com
ahartry@themoralesfirm.com
***ATTORNEYS FOR PLAINTIFF***