Case 4:20-cv-02445 Document 52 Filed on 03/18/22 in TXSD Page 1 of 20

United States District Court
Southern District of Texas
**ENTERED**
March 18, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MICHAEL ANDREW HARRINGTON, *et al*, <br><br> Plaintiffs, <br> VS. <br><br> ART INSTITUTES INTERNATIONAL LLC, *et al*, <br><br> Defendants. | § § § § § § § § § § § CIVIL ACTION NO. 4:20-CV-2445 |

## **ORDER**

Pending before the Court is the Motion for Summary Judgment filed by Defendants The Art Institutes International ("Ai Int'l") and The Art Institute of Houston, LLC d/b/a DC Art Institute of Houston, LLC ("Ai Houston) (collectively, the "Main Defendants"). (Doc. No. 42). In addition, Defendants The Art Institute of Austin Ai, LLC ("Ai Austin") and The Art Institute of San Antonio Ai, LLC ("Ai San Antonio") (collectively, the "Subsidiary Defendants") also filed a motion for summary judgment. (Doc. No. 43). Plaintiff Michael Andrew Harrington ("Harrington" or "Plaintiff") combined his response to both motions into one document (Doc. No. 45), and the Defendants[1] filed a combined reply (Doc. No. 48).

Also pending before the Court is Plaintiff's Motion to Strike the Declaration of Cid Yousefi, (Doc. No. 44), to which Defendants have responded in opposition, (Doc. No. 46), and Plaintiff has replied in support. (Doc. No. 49).

---

[1] The term "Defendants" will refer to Ai Int'l, Ai Houston, Ai Austin, and Ai San Antonio. Harrington also named another defendant, Studio Enterprise LLC, which allegedly provides enrollment management and marketing to Ai Houston. Studio Enterprise has not joined in any of the motions for summary judgment, nor has it filed an answer. Moreover, there is no indication in the record that Studio Enterprise has received service.

Finally, before the Court is Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. No. 47). Plaintiff has responded in opposition, (Doc. No. 49), and Defendant has replied in support. (Doc. No. 51). The Court will address each motion in turn.

## I. Background

This is a qui tam/retailiation action in which Harrington alleges that while he was employed by The Art Institute of Houston, LLC ("Ai Houston"), he witnessed acts of fraud against the United States government committed by staff in Ai Houston's financial aid office. Specifically, Harrington alleges that Ai Houston, through its Vice President of Operations Byron Chung, faked student enrollment in order to obtain funds under Title IV of the Higher Education Action of 1965 to which Ai Houston was not properly entitled. Harrington alleges that Chung sent him a spreadsheet ("Spreadsheet") which contained the names of 150 students who needed to be contacted to complete (and backdate) their paperwork for enrollment. The purpose of this exercise, as Chung allegedly told Harrington, was to protect the institution in the event of a government audit.

Harrington alleges that when he began reaching out to the students listed on the Spreadsheet, two students explained that they were not enrolled at Ai Houston. They had plans to enroll, but that they never authorized or requested federal funds to be withdrawn in their names. Harrington claims that he became concerned that Defendants were illegally receiving and retaining government funds. When he spoke to Chung about his concerns, Chung stated that Harrington was mistaken, and they he should continue to reach out to the listed students. According to Harrington, he refused to go along with the alleged scheme to obtain the funds and was fired as a result.

Harrington originally sued Ai Houston, The Art Institute International LLC, and Studio Enterprise LLC (which allegedly provides enrollment management and marketing to Ai Houston)

2

under the False Claims Act and for retaliation and wrongful termination. (*See* Doc. No. 1). The United States of America declined to intervene. (*See* Doc. No. 4). The Defendants moved to dismiss, and the Court ordered that the Defendants instead file a motion for summary judgment. (*See* Doc. No. 16). In the meantime, Harrington amended his complaint to add the Subsidiary Defendants. (Doc. No. 28). The Defendants have now moved for summary judgment. (Doc. Nos. 42, 43).

## II. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### III. Motion for Summary Judgment (Doc. No. 42)

Defendants' Motion for Summary Judgment offers three arguments: (1) Plaintiff's claims are based upon a misunderstanding of the Title VI funding process and are supported by speculation; (2) even if Plaintiff's allegations were proven, they would not amount to an FCA violation; and (3) Plaintiff has no evidence that his termination was based on any protected activity. The Court will address each of these arguments in turn.

A. Theoretical Possibility for Defendants to Fraudulently Collect Title IV Funds

*1. Defendants' Title IV Funding Process*

Defendants begin their Motion by contending that there is no evidence to show that the Title IV funding process makes it possible for them to have illegally obtained the funds. (Doc. No. 42 at 8). The Court is skeptical that any briefing or analysis is necessary on this issue. Whether an issue is *theoretically possible or impossible*—in this case, whether it was possible for Defendants to fraudulently collect Title IV funds—is not the Court's concern. The *material* issue is whether or not they *actually did* fraudulently collect Title IV funds. Nevertheless, the Court will evaluate this argument in terms of "possibility" because it has been fully briefed by the parties using that approach.

In their Motion, Defendants describe their funding process as follows: Defendants use a third party, Campus Ivy, to process requests, disbursements, and refunds of Title VI funding via Campus Ivy's "Core" system. (Doc. No. 42 at 9) (citing Deposition of Corey Tyberendt, Doc No. 42-1 at 110; Declaration of Cid Yousefi, Doc. No. 42-1 at 129). Defendants do not submit requests directly; instead, Campus Ivy processes all requests for funds. (Declaration of Cid Yousefi, Doc. No. 42 at 130). Once a student has applied, the relevant documents are entered into the Core system

4

either by the student, by the student's financial aid officer, or via an automatic integration with the government website. (Answer to Interrogatories, Doc. No. 42-1 at 130–31).

Defendants make disbursements to students from institutional (here, Defendants') funds, and then submit disbursement records to the Government for reimbursement. Defendants then provide Campus Ivy with records to show all funds that have been posted to the student's account. (Declaration of Cid Yousefi, Doc. No. 42-1 at 130; Answer to Interrogatories, Doc. No. 42-1 at 130–31). After Campus Ivy confirms that all of the necessary documentation—including an executed enrollment agreement—has been provided, it submits a request for funds from the Department of Education. (*Id.*). Only then will funds be disbursed to Defendants. (Declaration of Cid Yousefi, Doc. No. 42-1 at 131).

If a student does not actually enroll in classes, Defendants' Registrar updates the student record as appropriate. (Doc. No. 42 at 12) (citing Doc. No. 42-1 at 145–46). Campus Ivy regularly runs attendance reports to determine if any students have withdrawn from classes, and if they have, Campus Ivy processes refunds as appropriate. (Doc. No. 42-1 at 131). Therefore, per Defendants, it was not possible to fraudulently obtain Title IV funds as Plaintiff contends.

In response, Plaintiff begins by noting that Defendants use the testimony of their own employees to support the argument that it is impossible to illegally obtain Title IV funds. (Doc. No. 45 at 9). Rule 56 provides that parties may do this. Fed. R. Civ. P. 56. Plaintiff further argues that it is possible for Defendants to fraudulently obtain funds because Defendants provide student records to Campus Ivy and records demonstrating that a student has requested the funds. (*Id.*). Furthermore, Plaintiff notes that Defendants control the attendance database from which Campus Ivy determines whether refunds are owed, and thus have the opportunity to falsify the information therein. (*Id.*).

5

Plaintiff points to an email he received from Chung, which, according to Plaintiff, confirms that Defendants were registering students without enrollment agreements. (Doc. No. 45-13). Plaintiff also points to the deposition of Elden Monday, Defendants' Chief Operating Officer, to support the assertion that Chung had assigned Plaintiff to obtain backdated enrollment agreements, though Monday was uncertain whether a conversation between he and Chung on the topic had occurred. (Doc. No. 45-4 at 10). Additionally, Plaintiff relies on the testimony of Melanie Lindenmeyer ("Lindenmeyer"), Ai International's Vice President of State and Regulatory Finance Services, and Corey Tyberendt ("Tyberendt"), Ai Houston's Financial Aid Director, to confirm that it is theoretically possible for Defendants to receive Title IV funds to which they were not entitled. (Doc. 45-5 at 11; Doc. No. 45-6 at 11). Plaintiff also points to Tyberendt's testimony that allegedly makes clear that Defendants would fill out documents to obtain funding even if the student might not enroll. (Doc. No. 46-6 at 9). Plaintiff also notes that Lindenmeyer acknowledged that it is possible that Defendants could make false representations to obtain Title IV funds, in part because Defendants were responsible for keeping updated information on enrollment. (Doc. 45-5 at 8–9).

This is not the movant's burden under *Celotex*; however, since Defendants move solely on whether it was possible for them to fraudulently collect Title IV funds (as opposed to whether they actually did it), there is clearly a fact issue.[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

The Court finds that, based upon the evidence presented by Plaintiff, a genuine dispute of material fact exists with regards to whether Defendants could theoretically obtain Title IV funds

---

[2] Plaintiff has also argued that Defendants have not met their burden for judgment as a matter of law because they have failed to provide any evidence demonstrating that the money received was not fraudulently obtained. (Doc. No. 45 at 12–13).

6

illegally under the process described. Therefore, the Court denies the Defendants' Motion as it relates to this issue.

*2. Plaintiff's Evidence of Illegally Obtained Funds*

In the First Amended Complaint, Plaintiff alleges that Chung provided him with the Spreadsheet which contained the names of 150 students. (Doc. No. 28 at 7–8). Chung allegedly instructed Plaintiff to contact the students in order to formally execute their enrollment agreements (*Id.*). After allegedly speaking with two of the individuals listed on the Spreadsheet, and purportedly being informed that they did not intend to enroll nor had they authorized federal funds be withdrawn in their name, Plaintiff alleges that he relayed that information to Chung. (*Id.*). Chung allegedly told Plaintiff that he was mistaken and that he should continue contacting the individuals listed. (*Id.* at 8). It is based upon this work assignment—and the related conversations with Chung—that Plaintiff concluded that Defendants were illegally obtaining Title IV funds.

Defendants argue that Plaintiff has no evidence to support his claim that Defendants received approximately $2 million in Title VI funding from the individuals listed in the Spreadsheet. First, Defendants argue that Plaintiff has no evidence that any of the 150 individuals listed on the Spreadsheet were never enrolled, outside of the conversation he apparently had with Chung. (Doc. No. 42 at 12; *see also* Doc. No. 42-1 at 70). Plaintiff has not identified the two individuals who allegedly told him they had never enrolled, and the only evidence to support these conversations is Plaintiff's testimony about his conversation with Chung. (*Id.*).

Defendants point to Plaintiff's deposition to evidence that Plaintiff arrived at the $2 million amount by estimating the amount of funds he expected Defendants would have received based on the number of students listed on the spreadsheet and the estimated number of credit hours each student would have taken. (Doc. No. 42-1 at 78–79). Defendant ultimately concludes that

7

Plaintiff's calculations based on "unsubstantiated assumptions" and "pure speculation" are not competent evidence, and as a result, Plaintiff has failed to provide that Defendants actually received any payment in connection with the Spreadsheet.

In response, Plaintiff argues that first that Defendants "erroneously place the burden on Plaintiff to provide documents proving they received monies." (Doc. No. 45 at 12). Plaintiff argues that he does not have the documents, but that he has asked that they be produced in discovery. (*See* Doc. No 45-7, Ex. 6, Nos. 21, 22, 24). Furthermore, Plaintiff argues that he has testified that Chung told him that Defendants had received money for the listed students, evidence which has not been controverted by Defendants.

Defendants further contend that Plaintiff has failed to provide any evidence "that Chung directed him to contact 150 individuals on a purported spreadsheet and obtain backdated agreements." (Doc. No. 42 at 13). Defendants claim that they have diligently searched for the Spreadsheet but have never located it. (*Id.*) Furthermore, Defendants point out that Plaintiff himself has admitted that he does not have a copy of the Spreadsheet. (Doc. No. 42-1 at 176). Finally, Defendants point to the testimonies of Tyberendt and Lindenmeyer, who testified that they never provided any such list to Plaintiff or to Chung. (*See* Doc. No. 42-1 at 122–124; *see also* Doc. No. 42-1 at 147–148). Defendants argue that any statement made by Chung is inadmissible hearsay, and therefore, Plaintiff has failed to provide admissible evidence to support the fact that Defendants actually received government monies for students listed on the Spreadsheet.

Plaintiff again points to his deposition, in which he testified that Chung told him that he "needed to reach out to [the individuals listed on the Spreadsheet] to get them to sign a backdated enrollment agreement." (Doc. No. 45-3 at 12). Plaintiff contends that this is admissible evidence support his claim that Chung provided instructions for him to contact the individuals.

8

The Court finds that Plaintiff has presented sufficient evidence to create a genuine issue of material fact with respect to both his claim that Defendants received monies for the individuals listed on the Spreadsheet, and the Chung instructed him to contact those individuals. Plaintiff's alleged conversations with Chung, who was acting as an officer/agent of Defendants at the time of the conversation, qualify as statements by a party opponent within the scope of his employment, and are therefore not inadmissible hearsay. *See* Fed. R. Evid. 801(d)(2)(D) (explaining that an out-of-court statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.").[3] Therefore, the Court denies Defendant's Motion for Summary Judgment with respect to this issue.

B. Would the Allegations, If Proven Amount to an FCA Violation?

Defendants next argue that even in Plaintiff is able to prove the allegations, they do not constitute an FCA violation. (Doc. No. 42 at 15). Plaintiff has alleged FCA violations under three theories: (1) violation of 31 U.S.C. § 3729(a)(1)(A); (2) violation of § 3729(a)(1)(B); and (3) Defendants breached the terms of a consent judgment entered between the Department of Justice and EDMC, Ai International's former parent company.

*1. 31 U.S.C. § 3729(a)(1)(A)*

First, Defendants argue that the allegations do not amount to a violation of § 3729(a)(1)(A), which holds a person liable under the FCA if the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To demonstrate a violation of this section, Plaintiff must show: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was

---

[3] The Court addresses this point in more detail below when discussing Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence. (Doc. No. 47).

9

material; and (4) that caused the Government to payout money or forfeit moneys due. *U.S. ex rel Longhi v. U.S.*, 575 F.3d 458, 467 (5th Cir. 2009).

Defendants point to *U.S. ex rel. Gay v. Lincoln Tech. Inst., Inc.*, which states that "[a] 'claim' in the False Claims Act context consists of a request or demand on the government for money that induces the government to disburse funds or 'otherwise suffer immediate financial detriment.'" 2003 WL 22474586, at *2 (N.D. Tex. Sept. 3, 2003) (internal citations omitted). Defendants contend that the alleged conduct must involve a "claim" to constitute a cognizable FCA cause of action. (Doc. No. 42 at 15). Here, Defendants argue, "even if Plaintiff had evidence Ai Houston sought backdated enrollment agreements in connection with previously received Title IV funds, Movants would still be entitled to summary judgment because such acts would not constitute a 'false claim' under the FCA." (*Id.* at 15–16).

In response, Plaintiff points to his testimony, which states that Defendants received Title IV funds for students that never enrolled by having prospective students fill out various documents related to financial aid, and sending those documents to the government to receive funds under the guise that they were for students even though they never enrolled and they never attended the school. (Doc. No. 45-3 at 12). Plaintiff again relies on his testimony concerning his conversation with Chung, in which he claims Chung told him that "the Art Institute was supposed to return the money to the federal government, but they're not returning it" which is why he was tasked with obtaining signed backdated enrollment agreements (*Id.*).

The Court finds that Plaintiff's evidence is sufficient to demonstrate that a "claim" was made and denies Defendants' Motion with respect to this issue.

### 2. 31 U.S.C. § 3729(a)(1)(B)

Defendants also argue that Plaintiff's allegations do not amount to a violation of § 3729(a)(1)(B), which makes it a violation if a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants contend that there is no evidence of a "false claim" and that "there is no evidence Ai Houston made or used any false records or statements to get any false claim paid." (Doc. No. 42 at 17). Even if Ai Houston had intended to provide the backdated enrollment agreements to the Government later, Defendant points out that "Plaintiff admits no one ever actually obtained any backdated enrollment agreement." (*Id.* at 17–18) (citing Deposition of Harrington, Doc. No. 42-1 at 49).[4]

Plaintiff again points to his previous testimony, in which he stated that Defendants, based on his conversations with Chung, "would have the [prospective] student execute a document, seemingly to see how large of a loan they qualified for, but in reality, the document was a master promissory note obligating the student to pay back a loan." (Doc. No. 45 at 7) (citing Deposition of Harrington, Doc. No. 45-3 at 12). Plaintiff's testimony further details that Chung explained that Defendants used this fraudulently obtained paperwork to represent to the Government that it belonged to students who were actually enrolled, and received Title IV funds as a result. (*Id.*).

Additionally, Plaintiff testified that Chung told him that Defendants had received Title IV funds from students who did not attend the schools, and tasked Plaintiff with obtained backdated enrollment agreement to justify those funds. (Doc. No. 45 at 8) (citing Deposition of Harrington, Doc. No. 45-3 at 12). Plaintiff notes that Defendants offer no evidence to refute that this conversation with Chung never occurred. (Doc. No. 45 at 8).[5]

---

[4] The Court notes that Plaintiff stated that he was "unaware of" or "d[id] not know" whether any students in the Spreadsheet actually signed the enrollment agreement. (Doc. No. 42-1 at 49).

[5] Plaintiff notes that he subpoenaed Chung, but Chung did not appear for deposition. (Doc. No. 44 at 3).

11

The Court finds that Plaintiff, through his sworn testimony, has presented sufficient evidence to support his allegations of FCA violations. Defendants' Motion is denied on this point.

*3. Consent Judgment*

Next, Defendants argue that Plaintiff has failed to provide any evidence of an FCA violation in connection with a certain consent judgment ("Consent Judgment") entered between the United States Department of Justice and EDMC. (Doc. No. 42 at 18). Defendant first points to the terms of the Consent Judgment, which states that "all incoming students (other than graduate Students and Students who have already obtained twenty-four (24) or more credits at the post-secondary education level)" to complete orientation prior to attending classes. (Doc. No. 42-1 at 239). Defendant argues that this language makes clear that it is untrue that *all* students had to compete orientation. (Doc. No. 42 at 18).

Defendants further argue that Plaintiff has no evidence to support his assertion that Defendants violated the orientation requirement by submitting tickets to "Ai Houston's IT department claiming a student had attempted to complete the online orientation" even though the students had not actually attempted to do so. (*Id.*). Defendant contends that Plaintiff has not spoken to any of the alleged students, but instead claims that "he simultaneously heard both ends of telephone conversations" which support his claims. (*Id.* at 19).

Defendants contend that, even assuming that Plaintiff had evidence to support his claims, Ai Houston still would not have violated the FCA because "there is no evidence that Ai Houston's ability to receive Title IV funds was conditioned upon its compliance with the terms of the Consent Judgment." (*Id.* at 20); *see also U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 495 (S.D. Tex. 2003) ("The Fifth Circuit has emphasized that liability for a false certification will lie only if compliance with the regulation was a prerequisite to government payment, and the

defendant affirmatively certified such compliance."). Defendants assert that summary judgment is appropriate because Plaintiff has offered no evidence that Defendants breached the consent judgment nor made any material, affirmative false certification of compliance with any prerequisite of Title IV payment.

Plaintiff failed to address any FCA violation in connection with the Consent Judgment in his response. The Court finds that Plaintiff has failed to create a genuine dispute of material fact with respect to the Consent Judgment argument, and as a result, Defendants' Motion is granted to the extent it concerns FCA violations resulting from a breach of the Consent Judgment.

C. Retaliation

Defendants also argue that they are entitled to summary judgment with respects to Plaintiff's claim of "FCA Retaliation" (Count IV), and "Termination for Refusal to Commit an Illegal Act under Texas Law" (Count V).

*1. FCA Retaliation*

Defendants begin their argument by stating Plaintiff did not engage in any act to stop or prevent an FCA violation. The False Claims Act provides that an employee shall be entitled to relief if the employee "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms of conditions of employment because of lawful acts done by the employee" to stop an FCA violation. 31 U.S.C. § 3730(h)(1).

Defendants first state that they did not engage in any conduct that amounts to an FCA violation by which Plaintiff may make an FCA retaliation claim. They argue that any funds they allegedly received were received prior to any allegedly fraudulent act, making it impossible for there to have been a "false claim" associated with those payments. (Doc. No. 42 at 22). Defendants also argue that the supposedly backdated enrollment agreements "were not, nor were they intended

to be, presented to the Government to pay out money," and that "Plaintiff claims Ai Houston already received the Title IV funds without obtaining a single enrollment agreement from any of the 150 prospective students at issue." (*Id.* at 23).

The Court has already ruled that a genuine dispute of material fact exists as to whether or not Defendants' conduct amounted to an FCA violation. Thus, the Motion is denied with respect to whether or not Defendants' alleged actions amounted to an FCA violation.

*2. Evidence of Reported Fraud*

Defendant argues that Plaintiff has provided no evidence that he engaged in any efforts to prevent Defendants from committing an FCA violation prior to his termination. Defendants, pointing to the deposition of Lisa Hunter, Senior Vice President of Human Resources at Ai International, note that during his termination meeting, Plaintiff never mentioned the backdated enrollment agreements or any fraudulent conduct. (Doc. No. 42 at 20). Furthermore, Defendants note that Plaintiff "never made any report to human resources or to the company's anonymous hotline . . . that he believed Ai had engaged or attempted to engage in fraud against the Government." (Doc. No. 42 at 23) (citing Doc. No. 42-1 at 21). In fact, according to Defendants, the only proof that Plaintiff suggested any fraud on the part of Defendants was on the day of his termination, in an email sent to Hunter and Monday. (Doc. No. 42 at 24) (citing Doc. No. 42-1 at 276). Defendants contend that, because Plaintiff did not make any accusation against the company during his employment, his termination can not have been retaliatory.

Moreover, Defendants assert that even if Plaintiff did internally report the alleged fraud, Plaintiff has no evidence to demonstrate that such report had any impact on his termination. Citing Plaintiff's deposition, Defendants note that Plaintiff did not object to Chung's initial supposed instruction to obtain backdated enrollment agreements, nor did he object to Chung's alleged

follow-up instruction. (Doc. No. 42-1 at 45–46). It was not until September 27, 2019—over a week after Defendants' leadership allegedly made the decision to terminate Plaintiff—that Plaintiff objected to Chung's instructions concerning the enrollment agreements. As such, Defendants contend that there is no causal connection between any supposed internal report and the decision to terminate Plaintiff.

Plaintiff, in response, points to his testimony to show that on September 27, 2019, he told Chung that he would not contact the individuals listed on the Spreadsheet. (Doc. No. 45-3 at 16). Five days later, on October 2, 2019, Plaintiff was told by Hunter that he was being terminated for accessing a database he was not authorized to access. (*Id.* at 23). On the same day, however, Plaintiff received a letter ("Termination Letter") from Chung stating that he was terminated for "poor judgment" by sending an "E-Blast communication" on September 12, 2019, to students' personal email accounts. (Doc. No. 45-8 at 2). Thus, while Plaintiff offers no evidence that he filed a formal complaint prior to his termination, he contends that his refusal to contact individuals on the Spreadsheet flagged his suspicions that Defendants were engaged in fraudulent conduct.

The Court finds that Plaintiff's testimony regarding the alleged conversation with Chung on September 27 is sufficient to create a fact issue and denies Defendants' Motion with respect to evidence of Plaintiff's knowledge of the alleged unlawful activity.

### 3. *Termination for Refusal to Commit an Illegal Act under Texas Law*

Defendants note that Plaintiff appears to raise the *Sabine Pilot* exception to Texas's at-will employment doctrine. *See Sabine Pilot Serv., Inc., v. Hauck*, 687 S.W.2d 733 (Tex. 1985). The *Sabine Pilot* exception holds "that a terminated employee can recover damages against the former employer if the terminated employee can show that the 'sole cause' of [his or her] termination was [his or her] refusal to perform an illegal act." *Fitch v. Reliant Pharm., LLC*, 192 F. App'x 302, 303

15

(5th Cir. 2006). Importantly, however, "[a]n employer who discharges an employee both for refusing to perform an illegal act and for a legitimate reason or reasons cannot be liable for a wrongful discharge." *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 633 (Tex. 1995). Defendants point to Hunter's deposition to identify what they contend is a legitimate reason to terminate Plaintiff's employment. (Doc. No. 42-1 at 7–20). Specifically, Hunter testified that she understood the reason for Plaintiff's termination was because of "his extreme poor judgment" by sending an email to students, less than two weeks after joining Ai Houston, without obtaining prior approval as to the contents of the message or the list of recipients. (*Id.* at 10–12). Defendants note that Hunter testified that the Termination Letter stated "that we were terminating [Plaintiff] for his poor judgment as a result of sending out this blast e-mail and the impact it had on our current students, making them think that their school was closing." (*Id.* at 15).

Plaintiff again points to his testimony to show first that on September 27, 2019, he told Chung that he would not contact the individuals listed on the Spreadsheet, only to be fired five days later. (Doc. No. 45-3 at 16–23).

Plaintiff additionally argues that Defendants have been inconsistent with the identity of the individual or individuals involved in the termination decision, as well as when the termination decision was made. (Doc. No. 45 at 14–16). For example, in his deposition, Ronald Brown—Defendants' President—stated that Chung made the decision to terminate Plaintiff. (Doc. No. 45-11 at 10). In Defendants' Responses to Plaintiff Interrogatories, however, Defendants identified Chung, Hunter, and Monday as the decision-makers behind Plaintiff's termination. (Doc. No. 45-9 at 4). Plaintiff also notes that Defendants claim, in their Responses to Plaintiff Interrogatories, that the decision to terminate Plaintiff was made on September 19, 2019, whereas Brown, in his deposition, states that it was *not* made at the September 19, 2019, meeting he attended with Hunter,

Monday, and Chung. (*Compare* Doc. No. 45-9 at 4 *with* Doc. No. 45-11 at 10). Plaintiff concludes that the apparent inconsistencies surrounding the reasons for his termination give rise to a genuine dispute of material fact. (Doc. No. 45 at 16).

The Court first notes that Plaintiff's contentions surrounding the precise moment or meeting that Defendants made the decision to terminate him is flawed. Whether the decision was made at the September 19th meeting, or some other time that day, is unimportant so long as the decision was made near or around that day. Nevertheless, the Court finds that Plaintiff has sufficiently evidenced a genuine dispute of material fact with respect to the basis of his termination. The factual issues created by Plaintiff's testimony, in addition to what appears to be at least the appearance of inconsistency regarding the basis for determination, create a fact issue fit to be decided by a finder of fact. A jury is best situated determine Defendants' basis for Plaintiff's termination. Defendants' Motion is denied on this point.

### IV. Motion for Summary Judgment (Doc. No. 43)

Defendants Ai Austin and Ai San Antonio joined in Defendants' Motion for Summary Judgment, (Doc. No. 42), but also filed a separate Motion for Summary Judgment. (Doc. No. 43). In their separate Motion, the Subsidiary Defendants argue (1) that Plaintiff has no evidence that they violated the FCA, and (2) that Plaintiff has no evidence that they were involved in the decision to terminate Plaintiff. (*See generally* Doc. No. 43).

Plaintiff responds by pointing to Hunter's deposition, in which Hunter testified that Chung was Vice President of Operations for the entire system, which included the San Antonio and Austin campuses. (Doc. No. 45 at 13) (citing Doc. No. 45-12 at 5).

The Court finds that Plaintiff has failed to sufficiently create a genuine dispute of material fact on either of the two arguments raised by Subsidiary Defendants. Plaintiff has not provided

17

any specific evidence implicating Subsidiary Defendants beyond the fact that they were under the purview of Chung's supervision. Plaintiff, however, was not employed by either institution. Plaintiff's testimony only states that he knew only that Ai Houston was allegedly receiving Title IV funds illegally, and that "it could have been going on at other campuses." (Doc. No. 43-1 at 16–17). The Court finds that Plaintiff has not raised a genuine dispute of material fact and grants Subsidiary Defendants' Motion for Summary Judgment. (Doc. No. 43).

## V. Motion to Strike Declaration of Cid Yousefi (Doc. No. 44)

Plaintiff has filed a Motion to Strike the Declaration of Cid Yousefi. (Doc. No. 44). Plaintiff argues that Defendants failed to disclose Mr. Yousefi, nor the subject of his testimony, until moving for summary judgment. (Doc. No. 44 at 1). A party must provide initial disclosures containing the identity of each individual likely to have discoverable information which may be used to support claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(i). Failure to do so prohibits a party from using the information or witness on a motion unless the motion was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).

To evaluate whether a violation of Rule 26 is harmless, the Court must consider four factors: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation of the party's failure to disclose. *Texas A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

With respect to the first factor, the Court finds that the testimony of Cid Yousefi is important. Yousefi, as the CEO of Campus Ivy, offers a unique insight into the Defendants' Title IV funding process. An understanding of the process is critical when identifying potential

opportunities for fraud. The Court finds this factor weighs in favor of the violation being harmful to Plaintiff.

Moving to the second factor, the Court finds that Plaintiff was not prejudiced by the inclusion of Yousefi's testimony. It appears abundantly clear that Plaintiff was aware of Campus Ivy and its role in Defendants' Title IV funding process. For example, Tyberendt and Lindenmeyer each discussed the role Campus Ivy plays in the process. (*See* Doc. No. 45-4, Doc. No. 45-5). Defendants also disclosed Campus Ivy and its role in their responses to Plaintiff's Interrogatories. (Doc. No. 46-6). Defendants argue, and the Court agrees, that Plaintiff had knowledge of the role that Campus Ivy played in the funding process and had ample time to seek discovery from Campus Ivy prior to Defendants moving for summary judgment. (*See* Doc. No. 46 at 4–5). Given Plaintiff's knowledge of Campus Ivy's role, the Court finds that Plaintiff is not prejudiced by the inclusion of Yousefi's declaration. Moreover, as Defendants note in a footnote of their response, they have amended their Rule 26 disclosures to include Yousefi's information. (Doc. No. 46 at 7, n. 1). This factor heavily supports the violation being harmless.

As the Court finds that Defendants' failure to disclose Yousefi did not prejudice Plaintiff, the Court finds that the third and fourth factors, need not be addressed. The failure to disclose Yousefi to Plaintiff was harmless; therefore, the Court denies Plaintiff's Motion to Strike. (Doc. No. 44).[6]

## VI. Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. No. 47)

Finally, Defendants have filed a Motion to Strike Plaintiff's Summary Judgment Evidence. (Doc. No. 47). Specifically, Defendants argue that Plaintiff, in his Response to Defendants' Motions for Summary Judgment, relies almost exclusively on statements made by Chung and

---

[6] Plaintiff may depose Mr. Yousefi, if he so chooses, in order to prepare for trial.

Monday. (*See generally* Doc. No. 45). As the Court has already discussed, the Chung and Monday's statements do not constitute inadmissible hearsay because they qualify as an opposing party's statement pursuant to Fed. R. Evid. 801(d)(2)(D). Defendants' Motion is denied with respect to the statements made by Chung and Monday.

Defendants also argue that Plaintiff may not rely on his own testimony concerning the contents of the Termination Letter. Defendants support this argument by pointing to the "best evidence" rule, which holds that "[a]n original writing . . . is required in order to prove tis content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. The Court agrees. The Court grants Defendants' Motion to the extent that Plaintiff relies on his testimony to prove the contents of the Termination Letter, and the Motion is denied on all other grounds. (Doc. No. 47).

## VII. Conclusion

For the foregoing reasons, the Court **grants** Defendants' Motion for Summary Judgment as it pertains to the Consent Judgment and **denies** the Motion on all other grounds. (Doc. No. 42). Subsidiary Defendants' Motion for Summary Judgment is **granted**. (Doc. No. 43). Plaintiff's Motion to Strike is **denied**. (Doc. No. 44). Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence is **granted-in-part** and **denied-in-part**. (Doc. No. 47).

Signed at Houston, Texas, this 18th day of March, 2022.

Andrew S. Hanen
United States District Judge